**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

MAY 13 2019

JAMES W. McCORMACK, CLERK
By:_____
                                    DEP CLERK

DONALD TANNEHILL, on behalf of
himself and all others similarly situated,

                    Plaintiff,

vs.

SIMMONS BANK,

                    Defendant.

Civil Action No. _3:19-cv-00140 DPm_

**JURY TRIAL DEMANDED**

This case assigned to District Judge _MARSHALL_
and to Magistrate Judge_____ _HARRIS_

## CLASS ACTION COMPLAINT

Plaintiff Donald Tannehill, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to other allegations.

## INTRODUCTION

1.      Plaintiff brings this action on behalf of himself and classes of all similarly situated consumers against Defendant Simmons National Bank ("Simmons" or "Bank") arising from the Bank's routine practices of (a) assessing more than one insufficient funds fee ("NSF Fee") on the same item and charging *both* NSF Fees and overdraft fees ("OD Fees") on the same item; and (b) assessing *three* out-of-network ATM Fees ("OON Fees") on out-of-network ATM withdrawals immediately preceded by a purported "balance inquiry."

2.      These practices breach contractual promises; violate the covenant of good faith and fair dealing; and/or result in the Bank being unjustly enriched.

1

3.     Simmons's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Simmons.

4.     On behalf of himself and the Classes, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES

5.     Donald Tannehill is a resident of Niangua, Missouri, and holds a Simmons checking account.

6.     Defendant Simmons is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes. Simmons has its headquarters in Pine Bluff, Arkansas. Simmons has $16.5 billion in assets and provides banking services to customers through 230 bank branches in the states of Arkansas (84 branches), Colorado (3 branches), Illinois (4 branches), Kansas (6 branches), Missouri (45 branches), Oklahoma (18 branches), Tennessee (48 branches), and Texas (22 branches). Simmons is the third largest bank in Arkansas based on total deposits. Simmons operates banking centers, and thus conducts business, throughout the State of Arkansas, including three branches in Jonesboro.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed classes are comprised of at least 100 members; (2) proposed class members reside in at least eight states, meaning at least one member of the proposed classes resides outside of Arkansas; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Simmons is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.    SIMMONS CHARGES MORE THAN ONE NSF FEE ON THE SAME ITEM AND CHARGES BOTH NSF FEES AND OD FEES ON THE SAME ITEM

9.    As alleged more fully herein, Simmons's "TERMS AND CONDITIONS OF YOUR ACCOUNT" ("Deposit Agreement") allows it to charge a *single* $35 NSF Fee or a *single* $35 OD Fee when an item, including an electronic payment item, is returned for insufficient funds or paid into insufficient funds.

10.    Simmons breaches its contract when it charges more than one $35 NSF Fee on the same item, since the contract explicitly states—and reasonable consumers understand—that the same item can only incur a single NSF or OD Fee.

11.    The Bank similarly breaches its contract when it charges both a $35 NSF Fee (or multiple NSF Fees) and a $35 OD Fee on the same item since the contract explicitly states—and reasonable consumers understand—that the same item cannot incur both types of fees.

12.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed. Instead, Chase charges one NSF Fee even if an item is resubmitted for payment multiple times.

13.    Simmons's Deposit Agreement never discloses this practice. To the contrary, the Deposit Agreement indicates it will only charge a single NSF Fee or OD Fee on an item.

**A.    Plaintiff Tannehill's Experience.**

14.    In support of his claims, Plaintiff Tannehill offers an example of fees that should not have been assessed against his checking account. As alleged below, Simmons: (a) reprocessed a previously declined transaction two additional times; and (b) charged an additional fee upon reprocessing, for a total assessment of *three fees on a single item.*

15.    On October 17, 2018, Plaintiff Tannehill attempted an electronic payment to Planet Fitness in the amount of $23.84.

16.    Simmons rejected payment of that transaction due to insufficient funds in Plaintiff's account and charged him a $35 NSF Fee for doing so. Plaintiff does not dispute the initial fee, as it is allowed by Simmons's Deposit Agreement.

17.    Unbeknownst to Plaintiff, and without his request to Simmons to reprocess the item, however, twelve days later, on October 29, 2018, Simmons processed the same transaction yet again, and again Simmons rejected the transaction due to insufficient funds and charged Plaintiff *another* $35 NSF Fee.

18.    Unbeknownst to Plaintiff, and without his request to Simmons to reprocess the item, on November 19, 2018, Simmons processed the same transaction yet again, and this time Simmons paid the transaction into insufficient funds and charged Plaintiff a $35 OD Fee for doing so.

19.    *In sum, Simmons assessed Plaintiff $105 in fees in its effort to process a single payment of $24.84—a payment it could have simply made is the first instance into overdraft and charged one fee.*

20.    Plaintiff understood the payment to be a single item as is laid out in Simmons's

contract, capable at most of receiving a single NSF Fee (if Simmons returned it) or a single OD

Fee (if Simmons paid it).

**B.    The Imposition of Multiple NSF Fees on a Single Transaction Violates Simmons's Express Promises and Representations.**

21.    Simmons's Deposit Agreement states that a singular NSF Fee can be assessed on

checks, ACH debits, and electronic payments.

22.    Simmons's Deposit Agreement and Fee Schedule state that it will charge *$35 per*

*item* that is returned due to insufficient funds.

23.    According to the Fee Schedule, at most a *single* fee will be assessed when an

"item" is returned or paid into overdraft:

> A fee may be imposed if you overdraw your account. When you write a check, withdraw money in person or from an ATM, use your debit card to make a purchase, or make an automatic bill payment or other electronic payment for more than the amount in your account; you overdraw your account. Simmons Bank has the choice to either pay the item or not. If we pay even though you don't have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it you may be charged a Return Item Fee (Insufficient Funds (NSF) Fee [sic]. (Exceptions: Paid Item/Overdraft and Return Item/Insufficient Funds Fees are not charged on Affordable Advantage Checking accounts.)
>
> [...]
>
> Paid Item/Overdraft Fees on consumer accounts will not exceed $210.00 on any one given day.

| | Non-Customer | Customer |
|---|---|---|
| Paid Item/Overdraft Fee Per Item | Not offered | $35.00 |
| [...] | | |
| Return Item/Insufficient Funds (NSF) Fee Per Item | Not offered | $35.00 |

Fee Schedule, p. 5 (Exh. A hereto).

24.    The same "check...automatic bill payment or other electronic payment" on an account cannot conceivably become a new item each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit the item.

25.    There is zero indication anywhere in the Deposit Agreement that the same "check...automatic bill payment or other electronic payment" is eligible to incur multiple NSF Fees.

26.    Even if Simmons reprocesses an instruction for payment, it is still the same "check...automatic bill payment or other electronic payment." The Bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

27.    Indeed, the language quoted above makes clear that it is the action of the accountholder, and only the accountholder, that creates an item: "When *you write a check*, *withdraw money* in person or from an ATM, *use your debit card* to make a purchase, *or make an automatic bill payment* or other electronic payment..." As alleged herein, Plaintiff took only a single action to make a single payment; he may therefore be charged only a single fee.

28.    Moreover, by expressly linking OD Fees and NSF Fees in the disclosure, Simmons bolsters the reasonable assumption that only a single fee can be assessed on an item. Here's why: For an item charged an "overdraft fee" and thus paid into overdraft, there is no chance it can be subject to reprocessing and thus no chance it could be subject to a second or third fee, since it has already been paid. No reasonable contract reading could allow the *other* fee mentioned in the disclosure—the NSF Fee—to be treated so differently and assessed two or three times on the same item.

29.    The disclosures described above never discuss a circumstance where Simmons may assess multiple NSF Fees for an item that was returned for insufficient funds and later

6

reprocessed one or more times and returned again (incurring an NSF Fee) or paid (incurring an OD Fee).

30.    In sum, Simmons promises that one $35 NSF Fee or one $35 OD Fee will be assessed per ACH debit or check, and these terms must mean all iterations of the same instruction for payment. As such, Simmons breached the contract when it charged more than one fee per item.

31.    Reasonable consumers understand any given authorization for payment to be one, singular "check...automatic bill payment or other electronic payment," as those terms are used in Simmons's Deposit Agreement.

32.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Bank will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does Simmons disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do Simmons customers ever agree to such fees.

33.    Customers reasonably understand, based on the language of the Deposit Agreement and Simmons's other Deposit Agreement, that the Bank's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same item.

34.    Banks like Simmons that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this

abusive practice disclose it expressly to their accountholders—something Defendant here never did.

35.    For example, First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

36.    Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

37.    Simmons provides no such disclosure, and in so doing, deceives its accountholders.

## C.    The Imposition of Multiple NSF Fees on a Single Transaction Breaches Simmons's Duty of Good Faith and Fair Dealing.

38.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party.  In such circumstances, the party with discretion is required to exercise that power and discretion in good faith.  This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers.  Indeed, the Bank has a duty to honor

transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties. Here—in the adhesion agreements Simmons foisted on Plaintiff and its other customers—Simmons has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

39.    Simmons exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, Simmons abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Deposit Agreement. This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

40.    Simmons states only that it "may" assess these fees: "If we pay even though you don't have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it you may be charged a Return Item Fee (Insufficient Funds (NSF) Fee [sic]." But it is its standard policy to always to do, multiple times on the same item. This is an abuse of discretion.

41.    By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one NSF Fee or OD Fee on a single item, Simmons breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

42.     It was bad faith and totally outside Plaintiff's reasonable expectations for Simmons to use its discretion to assess two or three NSF Fees for a single attempted payment.

**D.      Simmons May Not Charge Both OD and NSF Fees on a Single Item.**

43.     Consistent with Simmons's express representations in its contracts, Plaintiff and reasonable consumers understand that any given instruction by them for payment to be one, singular "item" as that term is used in Simmons's contract documents.

44.     Simmons's contract documents bar Simmons from assessing both NSF Fees and OD Fees on the same item—but that is exactly what the Bank does.

45.     Simmons's Fee Schedule makes clear that a given transaction can either be paid into overdraft or returned unpaid:

> Simmons Bank has the choice to either pay the item or not. If we pay even though you don't have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it you may be charged a Return Item Fee (Insufficient Funds (NSF) Fee [sic].

*Id.*

46.     This is a dichotomy: the Bank may charge one fee or the other, but not both types. As alleged above, only a single fee of any type can be assessed on a given item or transaction.

47.     Despite the fact that the terms of the Deposit Agreement and Fee Schedule use starkly binary language, Simmons Bank frequently pursues both options with respect to a single item.  That is, it first rejects the transaction and charges a NSF Fee, then later authorizes the transaction and charges an OD Fee.

**E.      The Imposition of an NSF Fee and OD Fee on a Single Transaction Breaches Simmons Bank's Duty of Good Faith and Fair Dealing.**

48.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over

10

the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations. That means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Bank is prohibited from exercising its discretion to pile on ever greater penalties on the depositor. Here—in the adhesive agreements the Bank foisted on Plaintiff—Simmons Bank has provided itself numerous discretionary powers affecting Mr. Tannehill's bank account. But instead of exercising that discretion in good faith and consistent with Mr. Tannehill's reasonable expectations, the Bank abuses that discretion to take money out of his account without his permission and contrary to his reasonable expectations that he will not be charged multiple fees for the same item.

49.     Simmons's exploitation of its contractual discretion to the detriment of accountholders and resulting breaches good faith and fair dealing is most pronounced when it charges more than one NSF Fee on the same item or transaction, or charges both an NSF Fee and an OD Fee on the same item or transaction.

50.     First, Simmons engages in a pattern of rejecting, then approving, the same items in order to maximize fee revenue. Simmons initially denies, then approves, the same item in order to increase fee revenue.

51.     As alleged in the example above, Simmons exercised discretion to reject payment on the first iteration of Plaintiff's Planet Fitness transfer because Plaintiff purportedly had insufficient funds in his account. But it approved the third iteration of the same transaction even though Plaintiff still purportedly lacked sufficient funds and was in fundamentally the same financial position.

11

52.    The reject-then-approve pattern used by Simmons has one purpose:  to maximize fee revenue for the Bank.

53.    In addition to the discretion as to whether to pay or reject a transaction, Simmons also provides itself significant discretion as to whether or not to charge fees on a given transaction.

54.    By exercising its discretion in its own favor—and to the prejudice of Mr. Tannehill and other customers—by engaging in its "reject, then approve into overdraft" pattern, Simmons Bank abuses the power it has over Plaintiff and his bank account and acts contrary to his reasonable expectations under the Deposit Agreement.  This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

## II.    ATM CLAIM: THREE FEES FOR CASH WITHDRAWALS UNDERTAKEN WITH A BALANCE INQUIRY

55.    A Simmons accountholder who unsuspectingly checks his balance as part of a cash withdrawal transaction at an out-of-network ATM machine can expect to pay the following fees: 1) the customer will pay the ATM owner a surcharge for the *withdrawal*; 2) the customer also pays Simmons an OON Fee for making an out-of-network *cash withdrawal*; 3) and the customer will also pay Simmons another OON Fee for supposedly undertaking one or more balance inquiries during the cash withdrawal.  Thus, a single $20.00 withdrawal can generate between $5.00 and $8.00 in fees, including $2.00 in two separate fees to Simmons.

56.    Because the provision of balance inquiries are essentially cost-free to ATM owners, and because they are hugely profitable, ATM owners have placed a great emphasis in recent years on increasing the number of supposed balance inquiries undertaken at their machines—by any means necessary.

57.     In the last decade, the revolution of mobile banking applications and increasing legislative scrutiny on the punitive nature of independent ATM machine withdrawal surcharges has forced the ATM operators to seek other sources of revenue. The 2015 Independent ATM deployer survey sponsored by Kahuna ATM Solutions and the ATM Industry Association found that declining interchange rates were one of the top concerns for Independent ATM operators.[1] For example, one of the largest ATM operators repeatedly voiced this concern in its financial disclosures, stating:

> In addition to the impact of the net interchange rate decrease, we saw certain financial institutions migrate their volume away from some networks to take advantage of the lower pricing offered by other networks, resulting in lower net interchange rates per transaction to us. If financial institutions move to take further advantage of lower interchange rates, or if networks reduce the interchange rates they currently pay to ATM deployers or increase their network fees, our future revenues and gross profits could be negatively impacted.

*See* Cardtronics plc SEC Form 10-Q, filed May 3, 2018, p. 46 (available at https://www.sec.gov/Archives/edgar/data/1671013/000155837018003893/catm-20180331x10q.htm).

58.     Feeling the financial pressure of declining interchange rates, the ATM operators sought to increase revenue in other ways.

59.     They turned to balance inquiries to drive revenue. But they had a problem: very few consumers seek them out and are willing to pay for them.

60.     Americans, in short, use ATMs for the service of withdrawing cash, not to perform balance inquiries and transfers that are now commonly performed online or on mobile devices for free.

---

[1] *See* 2015 IAD Poll at https://www.atmmarketplace.com/news/2015-iad-poll-reveals-growing-attention-on-emv-shrinking-focus-on-mobile/ (last viewed May 9, 2019).

13

61.     ATM operators and banks have known for years that the vast majority of customers who come to use their ATM machines are there to perform *only* a cash withdrawal.

62.     This makes perfect sense.  Due to the availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access, paying for a balance inquiry at an ATM is not a rational act for the vast majority of consumers.  Moreover, the shelf-life of the information obtained through a balance inquiry is extremely short.  With checking accounts having numerous transactions that post throughout the day, as well as scheduled withdrawals that occur overnight, the viability of the information received through a balance inquiry at an ATM is only even arguably beneficial for the immediate business at hand, *i.e. the cash withdrawal*.

63.     Moreover, because consumers are entitled to receive, as part of their cash withdrawal, a printed receipt at the conclusion of their transaction, they already have free access to their account balances without having to engage in a separate balance inquiry.

64.     Therefore, when a consumer uses an ATM for a balance inquiry, it is almost always *in conjunction* with a cash withdrawal transaction.

65.     For all these reasons, historically only a tiny percentage of ATM transactions were for balance inquiries.  Very few consumers need this information urgently enough to pay for it.

66.     But ATM operators had a solution: lure consumers into balance inquiries via trickery and deception in order to increase balance inquiries from those customers who otherwise do not need them or would not be willing to pay for them as part of a cash withdrawal. The ATM operators have embraced a number of tactics to increase the number of balance inquiries supposedly performed at their ATM machines.

67.     When consumers use ATMs not owned by their own bank, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

68.     That message appears only after a user has decided to perform a cash withdrawal and entered the amount of cash she would like to withdraw.

69.     Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at OON ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.  But there is no warning whatsoever at an ATM that any form of balance inquiry could be an event worthy of a fee, either from the ATM owner or from the consumer's bank.

70.     Without such a notice, a balance inquiry appears to be nothing more than an unremarkable, free lead-in to a cash withdrawal to reasonable, diligent consumers.

71.     Second, many ATM operators use intentionally deceptive on-screen prompts to exploit and add to the consumer confusion resulting from a lack of an on-screen fee notice. While varying in certain ways, the intention and effect is the same: to trick American consumers into repeatedly paying more for a single ATM usage by increasing purported balance inquiries.

A.      **Overview of Claim.**

72.     Simmons's Deposit Agreement and Fee Schedule and other supporting documents misrepresent to accountholders the true nature of Simmons's assessment of these fees. Simmons's contract terms mislead accountholders to believe that a balance inquiry is not a separate, individual transaction; rather, accountholders are led to believe that a balance inquiry is

15

part of a single transaction, such as a deposit or withdrawal, conducted almost simultaneously at a single OON ATM.

73.    Simmons's uniform practice of charging two OON Fees per cash withdrawal preceded by a balance inquiry violates representations in Simmons's account documents, and constitutes a breach of contract, breach of the covenant of good faith and fair dealing, and/or constitutes unjust enrichment.  Indeed, Simmons's account documents fail to provide adequate notice of the possibility of being charged two fees by Simmons during one transaction at an OON ATM.

74.    American consumers simply do not know they can be assessed *three discrete fees for a simple OON ATM session that lasts less than two minutes.*  Simmons, along with the ATM owners, is all too happy to keep consumers in the dark.

75.    Simmons's account documents do nothing to place consumers on notice of the triple OON Fee for an out-of-network ATM withdrawal preceded by what they deem to be a consented-for "balance inquiry."

76.    When consumers use ATMs not owned by their own bank, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

77.    Thus, it is standard at ATMs in the United States that when a consumer uses an ATM not owned by his home bank, a message is displayed on the screen stating that usage of the ATM will cost a specified amount to proceed with a withdrawal of funds, and that such a fee is in addition to a fee that may be assessed by a consumer's financial institution for use of the ATM.

78.    Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at OON ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.

79.    Simmons knows this—that consumers expect a fair fee disclosure at the ATM—and has exploited consumers' reasonable expectation that they will only engage in fee-worthy actions knowingly and with appropriate disclosures—and will be provided a warning and an opportunity to cancel actions before being assessed a fee.  Simmons does this by assessing two or more additional OON Fees on consumers merely because they pressed buttons during a cash withdrawal transaction that the Bank, in its discretion, deems to be tantamount to requests for balance inquiries.

80.    Repeated exposure to such messages is partly responsible for building the reasonable consumer understanding that a balance inquiry is a common lead-in to a withdrawal, a mere first step to the real business at hand, an informational exercise offered by the ATM to help inform the cash withdrawal.

81.    Reasonable consumers like the Plaintiff do not, in sum, understand a balance inquiry to be an independent transaction worthy of a separate fee.

82.    Simmons knows this—that in the absence of a prominent warning otherwise, consumers expect a balance inquiry to be an integral, included part of a cash withdrawal.

83.    Simmons has designed a scheme to assess OON Fees on those purported balance inquiries.  The Bank preys on the common sense that a balance inquiry preceded by a cash withdrawal is not an independent and separate transaction and therefore should not form the basis for a separate fee.

17

84.     If a Bank is going to charge such a conscience-shocking fee, it must fully and fairly disclose such a fee in its account documentation. Simmons did the opposite—providing express and implied indications that balance inquiries undertaken in conjunction with cash withdrawals would *not* incur additional OON Fees. Alternatively, this practice constitutes a breach of the covenant of good faith and fair dealing or unjust enrichment.

**B.     Account Disclosures.**

85.     Against the backdrop of the reasonable consumer expectations and federal law above, Simmons's disclosures reinforce the reasonable understanding that no fee will be assessed for a balance inquiry—especially if ATM users are not warned beforehand.

86.     Simmons's disclosures also reinforce the common sense presumption that there can be no balance inquiry fee when such an inquiry is in conjunction with a cash withdrawal at the same ATM.

87.     Simmons's Deposit Agreement provides a misleading disclosure as to the number of fees an accountholder will be charged for an out-of-network withdrawal preceded by a balance inquiry—indeed, the Agreement only references fees charged by ATM owners, *not* by Simmons:

> **ATM Operator/Network Fees.** When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

Deposit Agreement, pp. 31-32 (Exh. B).

88.     In other words, Simmons discloses that ATM owners may charge fees for a balance inquiry, but only when a consumer does *not* complete a withdrawal as well.

89.     This is important, because the Fee Schedule is fairly understood to reiterate this promise that a fee for a balance inquiry only occurs when a funds transfer does not *also* occur:

18

| ATM Fees/Debit Card Fees: | Non-Customer | Customer |
|---|---|---|
| Withdrawal at a Simmons Bank ATM | $3.00 | No Charge |
| Withdrawal at a non-Simmons Bank ATM | Not offered | $1.00 |
| Balance Inquiry at a non-Simmons Bank ATM | Not offered | $1.00 |

90.     Based on the Deposit Agreement and the Fee Schedule, checking accountholders would have no reason to believe that a balance inquiry undertaken with a cash withdrawal will result in two separate OON Fees.

91.     Accountholders using non-Simmons ATMs are never warned that they will receive *two separate fees* from Simmons—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.  But that is exactly what happens.

92.     The most reasonable understanding of this disclosure is that for all activities incident to a cash withdrawal, including a balance inquiry undertaken simultaneously, a single $1 fee will be assessed.

93.     When a balance inquiry precedes a withdrawal, common sense and consumer expectation dictate that that two-step process is part of the same ATM use.

94.     In general, and in Plaintiff' case here, the ATM owner does not warn the user that there is a separate charge for a balance inquiry, and in fact the ATM owner does not charge a separate fee to the user for a balance inquiry. Therefore, the user can have no reasonable expectation that Simmons will assess a fee for an action that the ATM owner does not charge or warn about.

95.     Simmons accountholders using a non-Simmons ATM are never warned that they will receive two separate fees from Simmons—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.

96.     At the very least, Simmons uses contractual discretion in bad faith when it assesses two OON Fees during the same ATM use when a balance inquiry immediately precedes a cash withdrawal.

**C.     Plaintiff's OON ATM Balance Inquiry Transactions.**

97.     On numerous occasions, including, but not limited to October 19, 2018 and December 28, 2018, Plaintiff placed his Simmons debit card into an OON ATM in order to make a cash withdrawal. Following his transactions, Simmons issued bank statements showing he was assessed, in addition to the cash withdrawal surcharge paid to the ATM operator, a separate $1 fee from Simmons for making an out-of-network balance inquiry, and an additional $1 fee from Simmons for making an out-of-network cash withdrawal. For each aforementioned withdrawal, he paid three separate fees, including two to Simmons.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action on behalf of himself and on behalf of all others similarly situated pursuant to Federal Rule 23. The Classes include:

> All persons who, within the applicable statute of limitations period, were charged multiple NSF Fees for the same debit item in a Simmons checking account (the "Multiple NSF Class").

> All persons who, within the applicable statute of limitations period, were charged an NSF Fee and an OD Fee for the same item in a Simmons checking account (the "NSF/OD Class").

> All persons who hold a Simmons checking account who, within the applicable statute of limitations preceding the filing of this lawsuit, were assessed two or more OON Fees when they performed a balance inquiry prior to withdrawing cash at an out-of-network ATM (the "Balance Inquiry Class").

99.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors, and the members of their immediate families, and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

100.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add subclasses if necessary before this Court determines whether certification is appropriate.

101.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Simmons has acted on grounds generally applicable to the Classes.  Such common legal or factual questions include, but are not limited to:

a)      Whether Simmons improperly charged more than one NSF Fee on the same item;

b)      Whether Simmons improperly charged an NSF and OD Fees on the same item;

c)      Whether Simmons improperly charged OON Fees for balance inquiries made in conjunction with a withdrawal at out-of-network ATMs;

d)      Whether any of the conduct enumerated above violates the contract;

e)      Whether any of the conduct enumerated above violates the covenant of good faith and fair dealing;

f)      Whether any of the conduct enumerated above constitutes unjust enrichment;

g)      The appropriate measure of damages.

102.    The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more,

the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to Simmons's records. Simmons has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

103.    It is impracticable to bring members' of the Classes individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

104.    Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Simmons, as described herein.

105.    Plaintiff is more than an adequate representative of the Classes in that Plaintiff has a Simmons checking account and has suffered damages as a result of Simmons's contract violations, Simmons's violations of the covenant of good faith and fair dealing, and Simmons's unjust enrichment. In addition:

a)    Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)    There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c)    Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d)    Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

106.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

107.    Simmons has acted or refused to act on grounds generally applicable to each of the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each of the Classes as a whole.

108.    All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Classes)

109.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Petition as if fully set forth herein.

110.    Plaintiff and Simmons contracted for checking account services, as embodied in the Deposit Agreement and Fee Schedule.

111.    Simmons breached the terms of the Deposit Agreement and Fee Schedule.

112.    Plaintiff and members of the putative Classes have performed all of the obligations on them pursuant to the Bank's Deposit Agreement and Fee Schedule.

113.    Plaintiff and members of the putative Classes have sustained monetary damages as a result of each of Defendant's breaches.

### COUNT II
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Classes)

114.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Petition as if fully set forth herein.

23

115.    Plaintiff and Simmons contracted for checking account services, as embodied in the Deposit Agreement and Fee Schedule.

116.    All of the relevant states (with the possible exception of Texas) mandate that an implied covenant of good faith and fair dealing govern every contract.  For banking transactions, this is also mandated by the Uniform Commercial Code that has been adopted in each state.  The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

117.    This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

118.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit— not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

119.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.   Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

120.    Simmons breached the covenant of good faith and fair dealing as explained herein.

121.    Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

122.    Plaintiff and members of the putative Classes have performed all of the obligations imposed on them pursuant to the Deposit Agreement.

123.    Plaintiff and members of the putative Classes have sustained monetary damages as a result of each of Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT III
### UNJUST ENRICHMENT
#### (In the Alternative to COUNT I and COUNT II)
#### (On Behalf of Plaintiff and the Classes)

124.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Petition as if fully set forth herein.

125.    This Count is brought solely in the alternative.  Plaintiff acknowledges that his breach of contract claim cannot be tried along with unjust enrichment.

126.    To the detriment of Plaintiff and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

127.    Plaintiff and the Classes conferred a benefit on Defendant when they paid Defendant the fees that were not disclosed or allowed for in the in the Deposit Agreement and Fee Schedule.

128.    Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

129.    Plaintiff and the Classes, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.      Certifying the proposed Classes pursuant to Federal Rule of Civil Procedure 23, appointing the Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

B.      Declaring that Defendant's policies and practices as described herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing or unjust enrichment;

C.      Enjoining Defendant from the wrongful conduct as described herein;

D.      Awarding restitution of all fees at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.      Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.      Awarding actual and/or compensatory damages in an amount according to proof;

G.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H.      Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

I.      Awarding such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: May 10, 2019.

Respectfully submitted,

BY:    WATSON BURNS, PLLC

_/s/ William F. Burns_
William F. Burns (Ark. Bar No. 2008019)
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
bburns@watsonburns.com

Jeffrey Kaliel*
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 350-4783
jkaliel@kalielpllc.com

E. Adam Webb*
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

Tiffany M. Yiatras*
Francis J. "Casey" Flynn, Jr.*
CONSUMER PROTECTION LEGAL, LLC
308 Hutchinson Road
Ellisville, Missouri 63011
tiffany@consumerprotectionlegal.com
casey@consumerprotectionlegal.com

_Attorneys for Plaintiff_

\* _Pro hac vice_ application to be promptly filed

27