IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | |
|---|---|
| DONALD TANNEHILL, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| SIMMONS BANK, | ) ) |
| Defendant. | ) ) ) |

Case No. 3:19-cv-00140-DPM

Hon. D.P. Marshall Jr.

**DEFENDANT SIMMONS BANK'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Plaintiff Donald Tannehill brings a three-count putative class action complaint against Simmons Bank ("Simmons") related to certain fees assessed in connection with his Simmons checking account. Specifically, Mr. Tannehill disputes certain out-of-network ("OON") ATM fees, insufficient funds ("NSF") fees, and overdraft ("OD") fees shown on his monthly statements. As discussed below, the parties' contractual agreements defeat Mr. Tannehill's claims.

First, Mr. Tannehill's claims are barred for the independently dispositive reason that he does not allege that he complied with his account agreement's error resolution provisions. These provisions required notice and an opportunity to cure alleged errors. If Mr. Tannehill disagreed with fees assessed by Simmons, he was obligated to bring the alleged errors to Simmons's attention to give Simmons an opportunity to address the fees before he sued.

Second, Mr. Tannehill's claims distort unambiguous contractual language. With respect to OON ATM fees, Mr. Tannehill claims that Simmons cannot charge two $1 fees for cash withdrawals preceded by a balance inquiry. Yet, as shown below, Mr. Tannehill's account agreement expressly authorizes a $1 fee for each balance inquiry and cash withdrawal.

1

Third, with respect to NSF and OD fees, Mr. Tannehill claims that Simmons cannot charge a fee each time a previously rejected electronic payment request (here, from Planet Fitness) is resubmitted.  However, Mr. Tannehill neglects to explain the system through which electronic payments are processed, which is known as the Automated Clearing House ("ACH") Network.  Critically, under ACH rules—which are incorporated by reference into Plaintiff's account agreement—it is *the merchant's bank* (here, Planet Fitness's bank), not Simmons, who resubmits a previously rejected payment request.  While Mr. Tannehill attempts to give the impression that Simmons—on its own—initiated and "processed the same transaction" multiple times (Compl. ¶¶ 17-18), this is incorrect.  Moreover, Mr. Tannehill's account agreement expressly authorizes NSF/OD fees each time a payment request is processed on an overdrawn account.

Concerning these challenged fees, Mr. Tannehill brings three causes of action.  In Count I, Mr. Tannehill asserts a claim for breach of contract alleging that the fees breach the terms of his account agreement.  *Id.* ¶¶ 109-13.  In Count II, Mr. Tannehill asserts a claim for breach of the implied covenant of good faith and fair dealing.  *Id.* ¶¶ 114-23.  In Count III, Mr. Tannehill asserts an unjust enrichment claim in the alternative to Counts I and II.  *Id.* ¶¶ 124-29.  As demonstrated below, all of Mr. Tannehill's claims should be dismissed with prejudice.

## BACKGROUND[1]

Mr. Tannehill, a Simmons checking account customer residing in Missouri, challenges certain account fees.  One fee is a $1 OON ATM fee that Simmons charges for both balance inquiries and cash withdrawals.  Compl. ¶ 89.  The Complaint alleges that "[o]n numerous occasions," including twice in 2018, Mr. Tannehill withdrew cash from an OON ATM and each

---

[1] For purposes of this motion, Simmons accepts Mr. Tannehill's well-pled allegations as true, but denies all of Mr. Tannehill's claims of liability or wrongdoing.

time was charged two $1 fees by Simmons, one for withdrawing cash and the other for a preceding balance inquiry.  *Id.* ¶ 97.  The Complaint alleges that Simmons was only authorized to charge a single $1 fee covering both the cash withdrawal and balance inquiry.

The other challenged fees are NSF/OD fees where a previously rejected electronic payment request is resubmitted.  The Complaint alleges that on October 17, 2018, Mr. Tannehill attempted an electronic payment to Planet Fitness in the amount of $23.84.  *Id.* ¶ 15.  Simmons rejected the payment due to insufficient funds in Mr. Tannehill's account and charged him a $35 NSF fee.  *Id.* ¶ 16.  On October 29, 2018, the Complaint alleges that Simmons purportedly processed the transaction a second time, which Simmons rejected due to insufficient funds, again charging Mr. Tannehill a $35 NSF fee.  *Id.* ¶ 17.  On November 19, 2018, the Complaint alleges that Simmons purportedly processed the transaction a third time, which Simmons paid, overdrawing Mr. Tannehill's account and charging him a $35 OD fee for doing so.  *Id.* ¶ 18.  The Complaint does not take issue with the first $35 NSF fee, but alleges that Simmons is prohibited from assessing fees for the second and third payment attempts.  *Id.* ¶¶ 16, 19.[2]

All three payment attempts were processed through the ACH Network.  *Id.* ¶¶ 15, 30, 32-33 (alleging that Mr. Tannehill "attempted an electronic payment to Planet Fitness" and referencing that the fees at issue relate to "ACH debit[s]" or "ACH payment[s]").  As background, the ACH Network is a batch processing system used by financial institutions to process ACH transactions.  An ACH transaction has several steps.  First, a customer authorizes an electronic payment transaction with a merchant.  Second, the merchant (an "Originator") communicates

---

[2] All of the OON ATM fees and NSF/OD fees at issue were charged in 2018.  *Id.* ¶¶ 15-18, 97.  To the extent Mr. Tannehill later attempts to allege that Simmons charged any unauthorized fees prior to March 31, 2016, when Simmons was a nationally-chartered bank, Simmons reserves the right to argue that such claims are preempted by federal banking laws.

the authorization to a bank which is a member of the ACH network (an "Originating Depository Financial Institution" or "ODFI"). Third, the ODFI transmits the authorization through an "ACH Operator" to the customer's bank (a "Receiving Depository Financial Institution" or "RDFI"). Finally, the RDFI debits its customer's bank account. The following diagram illustrates how payments are processed through the ACH Network:



National Automated Clearing House Association ("NACHA"), 2019 Operating Guidelines, Ch. 1, *General Information* at 1-2 & Fig. 1-1 (excerpts attached as Ex. 1); *accord Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 426-27 (6th Cir. 2018); *PFG Precious Metals, Inc. v. Suntrust Bank*, 2012 WL 401487, at *1 (N.D. Ill. Feb. 7, 2012).

NACHA "promulgates rules for use of the ACH [Network] that participating financial institutions agree to follow." *Volden v. Innovative Fin. Sys., Inc.*, 440 F.3d 947, 949 (8th Cir. 2006). In his account agreement, Mr. Tannehill agreed "to be bound by automated clearing house association rules." Compl. Ex. B at 23; *id.* at 1 ("This agreement is subject to … other applicable

4

rules such as … payment processing system rules."). As explained in more detail below (at 13-14), NACHA rules allow a merchant's bank (here, Planet Fitness's bank, the ODFI), not the customer's bank (here, Simmons, the RDFI), to resubmit a payment request rejected for insufficient funds up to two times.[3] Accordingly, Simmons was not the entity who reinitiated the Planet Fitness payment attempts at issue.

Mr. Tannehill attaches two account documents as exhibits to his Complaint: (i) the "TERMS AND CONDITIONS OF YOUR ACCOUNT" (the "Deposit Agreement") (Compl. ¶ 9 & Ex. B); and (ii) "Simmons Bank Schedule of Fees and Charges" (the "Fee Schedule") (which lists the fees applicable to Plaintiff's account) (Compl. ¶ 23 & Ex. A). The Deposit Agreement provides that it is governed by Arkansas law. Compl. Ex. B at 1 ("This agreement is subject to applicable federal laws, the laws of the state of Arkansas and other applicable rules such as … payment processing system rules….").[4]

---

[3] The court may take judicial notice of NACHA rules on a Rule 12(b)(6) motion to dismiss, particularly because the rules are incorporated by reference into the parties' contract. *See U.S. ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 696 (8th Cir. 2014) (under Rule 12(b)(6), a court may consider "'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record'"); *Cachet Fin. Servs. v. C & J Assocs., Inc.*, 373 F. Supp. 3d 1303, 1304 n.2 (N.D. Cal. 2019) (taking judicial notice of NACHA rules); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661-62 (7th Cir. 2002) (finding that where plaintiff sues under a contract, "[defendant] is entitled to take the position that [plaintiff] has appended only a part of the relevant instrument and to append what it contends is the remainder"); *Prieto v. Election.com*, 2005 WL 3560596, at *2 (E.D.N.Y. Dec. 29, 2005) (explaining that court may consider contracts "in their entirety" under Rule 12(b)(6), including portions not attached to complaint); *Dials v. Watts Bros. Moving & Storage Sys.*, 2003 WL 23208987, at *3 (S.D. Ohio Nov. 24, 2003) (holding that where plaintiff attached "part of the contract" to complaint, defendant could reference the accompanying bill of lading on a motion to dismiss).

[4] To the extent that there is any question about whether this provision in the Deposit Agreement is an enforceable choice of law clause, Mr. Tannehill is a Missouri resident (Compl. ¶ 5) and Missouri law would govern if Arkansas law does not control. Simmons is not aware of any differences between Arkansas and Missouri law that would be material to the issues raised in this motion.

# ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts insist upon "'specificity in pleading' … to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007).

## I. The Complaint Fails To Plead Compliance With The Error Resolution Requirements In Mr. Tannehill's Deposit Agreement.

The express and unambiguous terms of Mr. Tannehill's Deposit Agreement require him to notify Simmons of alleged errors and allow Simmons an opportunity to cure the alleged errors before filing suit. The Complaint does not allege that Mr. Tannehill complied with the notice and cure requirements in the Deposit Agreement. Under Arkansas law, the agreement's notice and cure requirements are enforceable, and Mr. Tannehill has not pled otherwise.

Mr. Tannehill's Deposit Agreement expressly provides that he must report alleged errors on his account statements to Simmons with "reasonable promptness" and that failure to do so "precludes [him] from asserting a claim against us for any such errors":

> **Your duty to report other errors** - In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error – such as an encoding error. You agree that the time you have to examine your statement and report to us will depend on the circumstances. However, such time period shall not exceed 60 days. *Failure to examine your statement and report any such errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any such errors on items identified in that statement and as between you and us the loss will be entirely yours.*

Compl. Ex. B at 12 (emphasis added).

Mr. Tannehill's Deposit Agreement also contains detailed error resolution procedures specific to electronic fund transfers, including debit card and ATM transactions. *See id.* ("**Errors relating to electronic fund transfers or substitute checks** (For consumer accounts only) – For information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution."). The error resolution procedures provide that:

> **ERROR RESOLUTION NOTICE**
>
> In Case of Errors or Questions About Your Electronic Transfers, Call or Write us at the telephone number or address listed in this brochure, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.
>
> (1) Tell us your name and account number (if any).
>
> (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
>
> (3) Tell us the dollar amount of the suspected error.
>
> If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.
>
> We will determine whether an error occurred within 10 business days … after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days … to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days … for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your

>    account…. We will tell you the results within three business days
>    after completing our investigation. If we decide that there was no
>    error, we will send you a written explanation. You may ask for
>    copies of the documents that we used in our investigation.

*Id.* at 35-37.

Under Arkansas law, the "express language of the parties' agreement" dictates whether compliance with a notice and cure requirement is deemed a condition precedent to filing suit. *G & K Services, Co. v. Bill's Super Foods, Inc.*, 2009 WL 2982971, at *19-20 (E.D. Ark. Sept. 15, 2009). In *G & K*, the court found that compliance was not a condition precedent to filing suit in that case because "[t]here is nothing in this [notice and cure] provision, or in any other part of the Service Agreement, that places any conditions on the customer's right to sue … for [the contract's] breach." *Id.* (emphasis omitted). Here, in contrast, the Deposit Agreement provides that a failure to timely report errors "**precludes you from asserting a claim against us**." Compl. Ex. B at 12 (emphasis added). The Deposit Agreement's express language therefore makes clear that Plaintiff can only assert claims against Simmons if he timely reported alleged errors.

Missouri courts have also repeatedly enforced contractual notice and cure requirements. *See, e.g., Ballwin Plaza Corp. v. H. B. Deal Const. Co.*, 462 S.W.2d 687, 690 (Mo. 1971) ("Plaintiff should not have filed suit against defendant for damages from any such defects during such period of time without first giving defendant the opportunity to correct defects under the terms of the contract between the parties."); *Loeffler v. City of O'Fallon*, 71 S.W.3d 638, 642-43 (Mo. Ct. App. 2002) (following *Ballwin* and holding that "plaintiff should have given defendant an opportunity to correct any defects in accordance with the terms of the contract before filing suit"); *Dynacon Builders v. Janowitz*, 892 S.W.2d 807, 810 (Mo. Ct. App. 1995) ("Because the contract at issue in that case had a provision which guaranteed that any defect in materials or work would be cured within a set period, the plaintiff breached the contract by failing to give the

defendant an opportunity to correct the defect before the plaintiff sued.").

Other courts outside of Arkansas and Missouri have similarly enforced contractual notice and cure requirements where customers filed suit against financial institutions challenging allegedly unauthorized fees and other practices. *See, e.g., Giotta v. Ocwen Fin. Corp.*, 2016 WL 4447150, at *2-4 (N.D. Cal. Aug. 24, 2016), *aff'd* 706 Fed. App'x 421, 422 (9th Cir. 2017) (dismissing claims challenging fees charged by mortgage servicer); *Michael v. CitiMortgage, Inc.*, 2017 WL 1208487, at *3-4 (N.D. Ill. Apr. 3, 2017) (same); *Sotomayor v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 3163074, at *2 (S.D. Fla. Feb. 5, 2016) (same); *Hill v. Nationstar Mortg., LLC*, 2015 WL 4478061, at *3 (S.D. Fla. July 2, 2015) (same); *Allen v. JP Morgan Chase Bank*, 2016 WL 1029334, at *2 (S.D. Miss. Mar. 14, 2016) (dismissing claims alleging errors in mortgage servicing); *Higley v. Flagstar Bank, FSB*, 910 F. Supp. 2d 1249, 1254 (D. Or. 2012) (dismissing claim challenging mortgage assignment); *Johnson v. Countrywide Home Loans*, 2010 WL 5138392, at *2 (E.D. Va. Dec. 10, 2010) (dismissing claims alleging wrongful foreclosure).

In the absence of any allegation that Mr. Tannehill complied with the Deposit Agreement's error resolution requirements, it would defeat the agreement's purpose if Simmons were forced to litigate the notice and cure issue through discovery. The entire purpose of the error resolution requirements is to allow financial institutions and their customers to address alleged errors quickly and expeditiously without the need for protracted litigation. The Complaint's failure to allege that Mr. Tannehill complied with the error resolution requirements "precludes [Mr. Tannehill] from asserting a claim against [Simmons] for any such errors." Compl. Ex. B at 12.

**II.     The Complaint Fails To State A Claim For Breach Of Contract.**

Under Arkansas law, the elements of a breach of contract claim include "'the existence of a valid and enforceable contract between the plaintiff and defendant, the obligation of defendant

thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach.'" *Rabalaias v. Barnett*, 284 Ark. 527, 528-29, 683 S.W.2d 919, 921 (1985). "[W]hen a contract is free of ambiguity, its construction is a matter of law for the court to determine." *Floyd v. Otter Creek Homeowners Ass'n*, 23 Ark. App. 31, 35-36, 742 S.W.2d 120, 134 (1988). In construing a contract, courts "consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning." *Coleman v. Regions Bank*, 364 Ark. 59, 65, 216 S.W.3d 569, 574 (2005). Parties may not "strain the construction of ordinary terms in the contract to create ambiguity where one does not appear." *Ark. Burial Ass'n v. Dixon Funeral Home, Inc.*, 25 Ark. App. 18, 22, 751 S.W.2d 356, 357 (1988); *see also Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996) (explaining that "[a] contract is not ambiguous simply because the parties disagree as to its meaning" and that "[a] court may not use 'forced or strained meanings … to create an ambiguity'") (applying Missouri law).

Mr. Tannehill's distortion of the terms of his account agreement flouts these basic principles. Mr. Tannehill argues that Simmons breached the terms of the account agreement in two respects: by charging a separate $1 OON ATM fee for balance inquiries where the user also makes a cash withdrawal; and by charging NSF/OD fees where a merchant resubmits a previously-rejected electronic payment request. Compl. ¶ 1. Both practices are permitted by the governing account documents. Mr. Tannehill also argues—albeit not in connection with his contract claim—that Simmons improperly exercised its discretion to impose fees. *Id.* ¶¶ 39, 96. This claim, too, ignores the express terms of the account documents. Accordingly, as a matter of law, the Court should dismiss Mr. Tannehill's contract claim in its entirety.[5]

---

[5] In *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012 (E.D. Ark. 2015), and *Chandler v. Arvest Bank*, Case No. 3:18-cv-00043-DPM, Dkt. 39 (E.D. Ark. Aug. 8, 2018), claims challenging other types

> **A.     Simmons' Contract With Its Accountholders Unambiguously Permits OON ATM Fees For Both Balance Inquiries And Cash Withdrawals.**

As noted above, Mr. Tannehill takes issue with OON ATM fees charged by Simmons where a cash withdrawal is preceded by a balance inquiry. *Id.* ¶¶ 55-97. In such circumstances, Mr. Tannehill alleges that Simmons charges its accountholders two $1 fees, one for the balance inquiry and another for the cash withdrawal. *Id.*[6] Mr. Tannehill alleges that where a customer makes a balance inquiry and then withdraws cash at an OON ATM, the balance inquiry is purportedly not "an independent transaction worthy of a separate fee." *Id.* ¶ 81.

The problem with Mr. Tannehill's theory is that it is contradicted by the account documents that Mr. Tannehill himself attached to the Complaint. Mr. Tannehill's Deposit Agreement explains that he "may access [his] account(s) by ATM using [his] ATM card ... to," among other things: (i) "get cash withdrawals from checking or savings account(s)"; and (ii) "get information about ... the account balance on [his] checking or savings account(s)." Compl. Ex. B at 27. Mr. Tannehill's Fee Schedule then makes clear that there is a separate $1 fee for balance inquiries and cash withdrawals at OON ATMs:

| | NON-CUSTOMER | CUSTOMER |
|---|---|---|
| 10. ATM Fees/Debit Card Fees: | | |
| Withdrawal at a Simmons Bank ATM | $3.00 | No Charge |
| Withdrawal at a non-Simmons Bank ATM | Not offered | $1.00 |
| Balance Inquiry at a non-Simmons Bank ATM | Not offered | $1.00 |

Compl. Ex. A at 3-4. As a result, Mr. Tannehill's account documents unambiguously state that balance inquiries and cash withdrawals at OON ATMs are each subject to a $1 fee. A customer

---

of fees charged by Arvest Bank survived dismissal because Arvest Bank's account agreements were sufficiently ambiguous. Unlike those cases, there is no ambiguity here.

[6] Mr. Tannehill also alleges that accountholders are charged a third fee by the OON ATM owner. *Id.* Mr. Tannehill does not challenge fees imposed by ATM owners.

who checks his balance and then withdraws cash at an OON ATM is therefore on ample notice that he will be subject to a total of $2 in fees from Simmons.

Nothing in the account documents suggests that there is an exception for balance inquiries that precede cash withdrawals that would be subject to a *combined* $1 fee. The Complaint cites language in the Deposit Agreement warning that "you may be charged a fee for a balance inquiry even if you do not complete a funds transfer." Compl. ¶ 87 (quoting Compl. Ex. B at 31-32). But that language supports Simmons—not Mr. Tannehill—by reaffirming that balance inquiry fees are separate and distinct from cash withdrawals. Further, stating that a customer may be charged a fee for a balance inquiry when the customer does not complete a funds transfer has no bearing on what happens when a customer *does* complete a funds transfer. Contrary to the Complaint's suggestion, the cited language is not "fairly understood" to suggest that "a fee for a balance inquiry *only* occurs when a funds transfer does not *also* occur." Compl. ¶ 89 (first emphasis added). The Complaint inserts the word "only" where it does not appear in the Deposit Agreement.

Notably, in *Smith v. Fifth Third Bank*, 2019 WL 1746367 (S.D. Ohio Apr. 18, 2019), the court allowed claims challenging OON ATM balance inquiry fees to proceed where—unlike here—the bank's fee schedule failed to itemize the fees separately. Instead, Fifth Third's fee schedule listed a "Non-Fifth Third ATM Fee" of "$2.75 for U.S. *transactions*." *Id.* at *2-6 (emphasis added). In that context, the court found that the contract language was ambiguous as to whether a cash withdrawal preceded by a balance inquiry constituted one "transaction" or two. *Id.* Here, in contrast, Simmons' fee schedule unambiguously provides for separate $1 fees for each "Withdrawal" and "Balance Inquiry" at a non-Simmons ATM.

Finally, the Complaint contains voluminous allegations that ATM *owners and operators* use "deceptive" means to "increase[e] the number of supposed balance inquiries undertaken at

their machines." Compl. ¶¶ 56-71. But these allegations are irrelevant to Mr. Tannehill's claim against *Simmons*, who by definition does not own or operate the *out-of-network* ATMs at issue. (Simmons does not charge its customers *any* fees for balance inquiries or cash withdrawals at *Simmons* ATMs. Compl. Ex. A at 3-4.) The only relevant question as to Simmons is whether its account documents disclose that Mr. Tannehill will be charged a $1 fee for both cash withdrawals and balance inquiries at OON ATMs. The answer to that question is plainly "yes." By separately itemizing the fees without any exceptions, the Fee Schedule makes clear that there is a separate $1 fee for every cash withdrawal and balance inquiry at OON ATMs.

### B.  Simmons Is Permitted To Charge NSF/OD Fees Where A Merchant Resubmits A Previously-Rejected Electronic Payment Request.

Mr. Tannehill's claim challenging NSF/OD fees where a previously-rejected electronic payment request is resubmitted fares no better. Under ACH Network rules, it is *the merchant's bank* (here, Planet Fitness's bank), not Simmons, who resubmits the payment request. The Fee Schedule unambiguously states that Simmons will either reject an electronic payment request and charge an NSF fee, or make the payment into overdraft and charge an OD fee. Thus, with each electronic payment request processed through the ACH Network, Simmons is contractually authorized to reject payment or pay an item into overdraft and charge corresponding fees.

Mr. Tannehill's Fee Schedule explains that:

> A fee may be imposed if you overdraw your account. When you write a check, withdraw money in person or from an ATM, use your debit card to make a purchase, or make an automatic bill payment or other electronic payment for more than the amount in your account; you overdraw your account. Simmons Bank has the choice to either pay the item or not. If we pay even though you don't have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it you may be charged a Return Item Fee (Insufficient Funds (NSF) Fee).

13

Compl. Ex. A at 5; *accord* Compl. Ex. B at 6 ("**Overdrafts** – You understand that we may, at our discretion, honor withdrawal requests that overdraw your account….").

Mr. Tannehill's Fee Schedule then discloses the NSF/OD fee amounts "Per Item":

| | | Non-Customer | Customer |
|---|---|---|---|
| **14.** | **Paid Item/Overdraft Fee** | | |
| | Per Item | Not offered | $35.00 |
| **15.** | **Return Item/[NSF] Fee** | Non-Customer | Customer |
| | Per Item | Not offered | $35.00 |

Compl. Ex. A at 5.

Here, the Complaint alleges that Mr. Tannehill's $23.84 attempted electronic payment to Planet Fitness was the subject of three ACH transactions processed weeks apart on October 17, 2018, October 29, 2018, and November 19, 2018. Compl. ¶¶ 15-18. For the first and second transactions, Simmons rejected payment and charged Mr. Tannehill NSF fees. *Id.* ¶¶ 16-17. For the third transaction, Simmons paid the debit into overdraft and charged Mr. Tannehill an OD fee. *Id.* ¶ 18. Under the unambiguous terms of the account documents described above, the three electronic payment attempts constituted three "Items," authorizing three distinct fees.

Mr. Tannehill's allegation that these three ACH transactions processed weeks apart constitute a single "Item" appear to be based on a fiction that *Simmons* chose to put a single payment request through three times. *See* Compl. ¶¶ 17-18 ("Unbeknownst to Plaintiff, and without his request to Simmons to reprocess the item …, Simmons processed the same transaction yet again."). But that is not how the ACH Network operates. NACHA maintains rules for when an ACH transaction is returned for insufficient funds. *See* NACHA, 2019 Operating Guidelines, Ch. 10, *ODFIs and Return, Dishonored Return and Contested Dishonored or Corrected Return Entries* (excerpts attached as Ex. 2). Under NACHA rules, if the RDFI (here, Simmons) returns a

payment request to the ODFI (here, Planet Fitness's bank) for insufficient funds, *the ODFI* (not the RDFI) may, within 180 days, submit up to two additional payment requests "following the return of the original entry." *Id.* at OG53, OG55. Thus, it was Planet Fitness's bank—not Simmons—who submitted two additional payment requests, as permitted under NACHA rules. As noted above, Mr. Tannehill agreed to be bound by NACHA rules in his Deposit Agreement. Compl. Ex. B at 23.

That does not mean that Mr. Tannehill was at the mercy of Planet Fitness and its bank. If Mr. Tannehill wished to avoid repeated payment attempts and resulting NSF/OD fees because he did not have sufficient funds in his account, Plaintiff's Deposit Agreement with Simmons allowed Mr. Tannehill to stop pre-authorized payments. *See* Compl. Ex. B at 32 ("PREAUTHORIZED PAYMENTS ● **Right to stop payment and procedure for doing so**. If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here is how….") (emphasis in original). The Complaint does not allege that Mr. Tannehill ever placed a stop payment on Planet Fitness's attempts to charge his account.

In sum, Mr. Tannehill's account agreement authorizes Simmons to charge NSF/OD fees each time a payment request is processed on an overdrawn account. Accordingly, Mr. Tannehill's breach of contract claim should be dismissed.

### III. The Complaint Fails To State A Claim For Breach Of The Implied Covenant Of Good Faith and Fair Dealing.

In Count II, the Complaint asserts a separate claim for breach of the implied covenant of good faith and fair dealing. Under Arkansas law, there is no standalone claim for breach of the implied covenant of good faith and fair dealing. *See Mountain Home Flight Serv., Inc. v. Baxter Cty., Ark.*, 758 F.3d 1038, 1043 (8th Cir. 2014) ("The Supreme Court of Arkansas has clarified that Arkansas contract law does not recognize a 'separate contract claim for breach of a duty of

good faith and fair dealing.'") (quoting *Ark. Research Med. Testing, LLC v. Osborne*, 2011 Ark. 158 (2011)).  Count II therefore fails to state a claim and should be dismissed.[7]

## IV.     The Complaint Fails To State A Claim For Unjust Enrichment.

The Complaint concedes, as it must, that Mr. Tannehill's unjust enrichment claim "cannot be tried" along with a breach of contract claim and is pled "solely in the alternative."  Compl. ¶ 125.  An "alternative" claim for unjust enrichment is unnecessary and improper here because there is no dispute that a contract—*e.g.*, the Deposit Agreement, Fee Schedule, and other account documents—governs the parties' relationship.  *See, e.g., QHC of Springdale, Inc. v. Archer*, 2009 Ark. App. 692, 373 S.W.3d 318, 325 ( 2009) ("Where the parties have an enforceable contract that fully addresses a subject, they must proceed on that contract in resolving their differences."); *accord Budach v. NIBCO, Inc.*, 2015 WL 3853298, at *8 (W.D. Mo. June 22, 2015) (explaining that "[a]n unjust enrichment claim is unavailable"—even in the alternative—"when the alleged benefit conferred is the subject matter of a contract").  Simmons fully complied with the unambiguous provisions of Mr. Tannehill's account documents in charging the OON ATM fees and NSF/OD fees at issue.  Mr. Tannehill cannot use an unjust enrichment claim to alter or expand the parties' contractual obligations.  Count III should therefore be dismissed as well.

---

[7] Missouri law is similar.  Under Missouri law, the implied covenant of good faith and fair dealing also does not give rise to an independent cause of action apart from the contract itself and cannot be used where a defendant's actions were contractually authorized.  *See Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 466 (Mo. 2017) (holding that where defendant's actions were allowed under contract, "there can be no breach of the implied covenant of good faith and fair dealing"); *Rock Port Market, Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188 (Mo. Ct. App. 2017) (explaining that a breach of the covenant of good faith and fair dealing "is a contract action" and that the covenant "'is not an overflowing cornucopia of wished-for legal duties'"); *Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 506 (Mo. Ct. App. 2004) (explaining that the covenant of good faith and fair dealing "cannot be used to contradict or override the *express* … terms contained in a contract") (emphasis in original).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  July 15, 2019

Respectfully submitted,

E. B. Chiles IV (96179)
R. Ryan Younger (2008209)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 Telephone
(501) 379-1701 Facsimile
ryounger@qgtlaw.com

Debra Bogo-Ernst (*pro hac vice*)
Matthew C. Sostrin (*pro hac vice application forthcoming*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 Telephone
(312) 701-7711 Facsimile
dernst@mayerbrown.com

*Attorneys for Simmons Bank*